**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**GULF ISLAND SHIPYARDS, LLC ET AL** | **CIVIL ACTION**

**VERSUS** | **NO. 22-154**

**LASHIP, LLC, ET AL** | **SECTION "L" (5)**

### FINDINGS OF FACT & CONCLUSIONS OF LAW

On August 29, 2021 Hurricane Ida struck the Houma Navigation Canal upon which Plaintiff, Gulf Island Shipyards, and Defendant, LaShip, LLC, each had facilities. Plaintiff alleges that a vessel moored at Defendant's facility, namely, the Betty Chouest, broke away from its moorings at the LaShip facility and swept downstream towards Plaintiff's facility where it struck and damaged a dock and two of Plaintiff's ships. The Betty Chouest's impact allegedly unmoored one of these two ships, namely the Wild Horse, which then attached to the Betty Chouest and both vessels continued to sweep through the Canal allegedly striking more of Plaintiff's property including another dock and more vessels. Plaintiff alleges that Defendant was negligent because it did not properly moor and secure the Betty Chouest. Plaintiff seeks damages for the cost of investigation and surveying the damage, the cost to repair to their ships, docks, and structures, and lost profits caused by the downtime of their facilities.

Defendant generally denies liability and offers affirmative defenses including (1) Plaintiff fails to state a cause of action, (2) the damages were caused by Plaintiff's negligence, and (3) force majeure. Furthermore, Defendant argues that pursuant to 46 U.S.C. § 30501 *et seq.*, if liability is found, their liability as a shipowner should be limited to the value of their interest in the Betty Chouest. Defendants additionally assert a counterclaim against Gulf Island Shipyards, alleging

1

that as a result of Gulf Island's inadequate mooring of the Wild Horse, the Wild Horse broke free, drifted uncontrollably down the Canal, and allided with the Betty Chouest and caused it damage for which Gulf Island Shipyards is liable.

These conflicting positions raise questions of fact which must be resolved at trial. Accordingly, this matter came on for trial before the Court without a jury on December 11, 2023.

After considering all of the testimony, exhibits introduced into evidence, and the applicable admissible portions of the record, the Court issues the following findings of fact and conclusions of law.  To the extent that any finding of fact constitutes a conclusion of law, the Court finds it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court adopts it as such.

<u>**FINDINGS OF FACT**</u>

**A.  The Parties and Relevant Vessels:**

1. LaShip L.L.C. ("LaShip") is a vessel docking facility and shipyard located in Houma, Louisiana and bounded on the west by the Houma Navigational Canal.

2. Reel Pipe, LLC ("Reel Pipe") owned the M/V Betty Chouest at all relevant times, including on August 29, 2021.

3. The Betty Chouest is an all-welled steel, twin diesel screw, U.S.C.O. inspected offshore supply vessel measuring 261.5 feet x 65 feet x 24 feet, of 2996 gross tons and 1066 net tons, built during 2007 and bearing Hull #233 and official no. 1193951.

4. Gulf Island Shipyards ("Gulf Island") is a shipyard located along the eastern bank of the Houma Navigation Canal in Houma, Louisiana approximately 1000 yards downstream from LaShip facility. Gulf Island specializes in the design, construction, and repair of marine vessels.

In addition to repair and maintenance, Gulf Island fabricates new marine vessels, including offshore supply vessels, research vessels, tugboats, salvage vessels, and barges.

5. In August 2021, Gulf Island was the custodian of two multi-purpose offshore service vessels, the Wild Horse and the War Horse, which were both under construction and which lacked any means of propulsion. Both the Wild Horse and War Horse were moored at a Bollinger Houma Shipyards, LLC ("Bollinger") facility's dock pursuant to a lease arrangement between Bollinger and Gulf Island. The Bollinger dock is located on the western bank of the Houma Navigational Canal approximately 400 yards downstream and across from the LaShip facility. Both the Wild Horse and the War Horse were ABS "Maltese Cross AI" class vessels measuring 365.5 feet in length and 76 feet across the beam.

6. The M/V Salvo was a ferry under construction at Gulf Island's facility and which was in a slip accessible from the Canal south of the LaShip facility. Also in the slip were a dock and a work barge owned by Gulf Island.

**B.  Pre-Incident Occurrences and Preparations for the Storm:**

1. In advance of Hurricane Ida's arrival, the mooring plan for the Wild Horse and War Horse included several large concrete blocks of approximately 25 tons, which were located in the Bollinger dock yard adjacent to the dock. These blocks were not buried. The Wild Horse and the War Horse were each tied or secured to the blocks. In addition, other lines were tied off to stationary bollards. The Wild Horse was moored in the southern position with the War Horse above. The two vessels were moored bow to stern with their starboard sides facing the channel. In anticipation of Hurricane Ida, Gulf Island initially planned to supplement the moorings with crawler cranes attached to the vessels to provide additional anchorage points. But this was not done.

2. As of August 29, 2021 eighteen (18) offshore service vessels of varying dimensions were in the care, custody and control of LaShip and moored at its facility. Fourteen of these vessels were located on the eastern bank of its facility up channel from the Bollinger dock where Gulf Island had moored the Wild Horse and War Horse. These eighteen offshore service vessels, which included the Betty Chouest, were moored three sets abreast in a line one after the other with their starboard side to the dock. The Betty Chouest was in the second set of three, in the middle position. She was moored between the M/V Norbert Bouziga and the M/V C-Pacer. The vessels were of various lengths, berths and tonnages. The vessel closest to the shore in each of the sets was secured to the shore and the other vessels secured to each other.

3. Along the bulkhead of the LaShip facility are single pile mooring structures consisting of 24-inch diameter pipe driven vertically, extending approximately six feet above ground with a cross bar approximately four feet above ground. With the exception of the northern most tier, the ships nearest to the shore were each secured to shore with four individual synthetic ropes: one from the bow to a shore mooring structure; one from the stern to a shore structure, and one each from two side bitts tied to separate mooring structures. Additionally, LaShip supplemented the moorings of the shore side vessels in anticipation of Hurricane Ida by welding steel padeyes at the gunwale along the flanks of these vessels. Steel wires were attached to the padeyes and were fastened to the mooring structures on land. With regard to the northernmost tier, William John Thomassie, LaShip's expert engineer, testified that "the bow of the northern most tiered vessels did not have any moorings or bulkhead beyond its bow, so it couldn't throw a line forward. ... So that one had a slight weakness relative to the others and vulnerability to wind from the north." Thomassie Transcript, 61:17-61:25.

4

4. The ship-to-ship vessels were each moored to each other with four individual synthetic ropes.

**C. The Incident:**

1. Hurricane Ida, a category 4 hurricane with estimated peak winds of 150 miles per hour, struck Louisiana in August of 2021. The evidence and credible testimony at trial established that Hurricane Ida made landfall in Port Fourchon, approximately 60 miles southeast of Houma, on August 29, 2021 at 11:55a.m. Setzer Report, Ex. 60 at 6. Between 1:30 to 1:50p.m., Hurricane Ida's average wind speeds in the Houma area were 42mph from the north beginning at 1:30p.m. with maximum gusts of 70 mph coming from the north/northeast by 1:55p.m. Clark Report, Ex. 65. At 2:32p.m. Hurricane Ida's outer eye wall hit the LaShip facility with wind gusts of up to 80 mph. Setzer Report, Ex. 60 at 16. Between 3:30 and 4:30p.m., Ida's inner eye wall passed over the LaShip facility and between 4:30 pm and at 5:13p.m. the eye of Ida passed close to LaShip's facility with wind gusts between 78 and 120 mph. The strongest winds from Ida passed over the LaShip facility between 3:30 and 5:13p.m. *Id.* at 23-24.

2.  At about 1:45p.m., early in the storm, the vessels along the LaShip bulkhead began breaking loose. Cooper Testimony (by depo.), 46:4-46:11. At this time, the winds were from the north with speeds about 40 mph with gusts of 70 mph, not yet maximum hurricane winds. The first tier of  vessels in the northern most tier were not shielded from the north wind and were not adequately secured since the bow of the vessel in this tier abutting the bulkhead could not be properly secured to the bulkhead and as a result this tier broke loose and cascaded down, causing the other vessels to come loose and float freely southbound down the Houma Navigational Canal in the direction of the War Horse and Wild Horse.

3. Significantly, the offshore supply vessel M/V Eland was dry docked at LaShip directly across from the Wild Horse and War Horse with a full complement of crew during the storm. The officers of the Eland testified that from the bridge of their vessel, they had a clear view of the LaShip breakaway vessels and the Wild Horse and War Horse as the LaShip breakaway vessels proceeded down the Houma Navigational Canal during the storm. The officers of the Eland testified that none of the breakaway LaShip vessels came in contact with either the Wild Horse or War Horse while these vessels were moored at the Bollinger dock. Testimony of Cooper (by depo.), 49:17-50:14. In fact, Dalton Cooper, the Master of the Eland, testified that the farthest drifting LaShip vessel only reached approximately halfway across the Canal, nowhere close the docked Gulf Island vessels. *Id.* at 50:7-50:14.

4. Master Cooper of the Eland testified that after the LaShip breakaway vessels passed, the War Horse and Wild Horse remained moored at the Bollinger dock in the same relative position in which they had been moored that day. *See* Cooper Testimony (by depo.), 52:5-52:9; Applewhite Testimony (by depo.), 36:2-37:17. Then at least one hour after the last LaShip breakaway vessel passed, around 3:10p.m., the wind shifted to a more northwesterly direction and the Wild Horse and War Horse independently broke free from their moorings. Cooper Testimony (by depo.), 52:24-53:21; Applewhite Testimony (by depo.), 40:4-40:18. The Wild Horse broke fully free while the War Horse broke partially free. The Wild Horse floated down the Canal and came to rest in Gulf Island's slip south of the LaShip facility where the Betty Chouest had also come to rest. Somewhere along the way, or even in the slip, the Wild Horse and the Betty Chouest came in contact with each other.

5. Prior to breaking loose, the Wild Horse was moored at the Bollinger dock aft of the War Horse. The moorings that were in place at the time were insufficient and inappropriate for mooring

vessels of the size of the Wild Horse and War Horse. A mixed variety of steel wires and synthetic ropes of different sizes and materials were used. This mooring method is against recommended practices and presented a substandard mooring as used on these vessels. Thomassie Transcript, 36:6-37:7, 39:9-39:22. Moreover, the concrete blocks to which the vessels were moored were not buried and there were no crawler cranes to provide additional anchorage points. *Id.* at 42:22-43:23. As a result, the concrete blocks were dragged along the wharf, allowing the vessels to move away from their positions into the current of the Canal. *Id.* at 47:20-49:2. This mooring method was also improper and presented substandard moorings. These substandard moorings allowed the Wild Horse to break loose and float freely down the Houma Navigational Canal and eventually come into contact with the Betty Chouest.

6. Gulf Island claims that the estimated repair costs for the Wild Horse totaled $899,547.79, which is comprised of $804,420 for estimated hull steel repairs and fenders and $95,127.79 for estimated replacement of motors, pumps, and labor.

7. As for the War Horse, Gulf Island's estimated damages total $114,935.65, consisting of the cost for hull steel repairs and fenders. Gulf Island also claimed it incurred $100,000 in necessary repair costs to the M/V Salvo, a ferry under construction at Gulf Island's facility as of August 29, 2021 and which it alleges was damaged by the Betty Chouest upon the Betty's landing in the slip where the ferry was positioned.

8. Gulf Island further claims damages for post-breakaway internal labor costs related to attending to and recovering the Wild Horse and War Horse, retrieving the concrete blocks from the Canal, survey and diver costs post-breakaway, purchasing mooring ropes and kits to remoor the Wild Horse and War Horse, towing costs to retrieve the Wild Horse and War Horse post-breakaway, drydocking expenses, miscellaneous expenses, and damage to the Bollinger bulkhead,

an amount for which Gulf Island and Bollinger have already settled but which Gulf Island avers LaShip is liable because the damage was the result of the Wild Hose and War Horse breakaways.

9. The Betty Chouest allegedly sustained damages totaling approximately $898,945.36 as a consequence of the collision between it and the Wild Horse. The Betty Chouest was subsequently sold since the incident and as a condition of the sale, $860,201.00 in repairs were performed at Reel Pipe's expense. *See* Invoice, R. Doc. 65-8. Defendants seek $898,945.36 in damages from Gulf Island, claiming this was the sum reported to the Betty Chouest's insurers for incident-related expenditures.

10. At trial, it was shown that the estimated costs to repair the Wild Horse offered by Gulf Island included items that predated Hurricane Ida. Specifically, Gulf Island claimed $95,127.79 for damage to the Wild Horse's pumps but at trial it was shown that there was significant water intrusion and damage that predated the storm and therefore this damage was not shown by a preponderance of the evidence to have been caused by the events during Hurricane Ida. *See, e.g.*, Ex 56 at 7-9. Further, LaShip's marine surveyor expert, Austin Glass, highlighted that between January and July 2023, the estimate that Gulf Island provided for hull steel repairs to the Wild Horse rose from $503,130.51 to $804,420.00. Ex. 58 at 2-3; Ex. 22 at 10; Ex. 35 at 8. At trial, no credible explanation was given to explain these increased costs and no associated increase was included on the War Horse's estimated repairs for similar line items.

11. Following trial, the Court concludes that Gulf Island has proven it is entitled to damages to the Wild Horse, minus the damages sought for the pump repairs, as these damages preexisted Hurricane Ida. But Gulf Island is not entitled to damages to the War Horse, as the Court finds no collision or allision occurred prior to the vessels each independently breaking loose. Accordingly, Gulf Island is not entitled to recover for damage to the bulkhead and other post-breakaway costs,

as the breakaways occurred as a result of Gulf Island's substandard mooring and not as a result of the Betty Chouest coming into contact with the vessels or facilities.

12. Because the parties could not show by a preponderance of the evidence that the Betty Chouest caused the damages to the Salvo ferry, the Court also finds that Gulf Island is not entitled to recover from LaShip for damage to the Salvo. While there is some evidence to show contact between the Betty Chouest and the Salvo, specifically orange paint transfer on the Salvo, which presumably came from the Betty Chouest, the evidence suggests that this damage was "fairly minor" and "not indicative of a large force." *See* Tulloch Testimony, 96:1-96:7. The Court therefore cannot conclude by a preponderance of the credible evidence that LaShip is liable for the damages to the Salvo.

13. Thus, the Court finds that Gulf Island has proven damages in the amount of $503,130.51.

14. The Court finds that Defendants have proven damages to the Betty Chouest in the amount of $860,201.00, as these costs were necessarily incurred by Reel Pipe as a condition of the sale of the Betty Chouest.

## <u>CONCLUSIONS OF LAW</u>

### I.      Jurisdiction

1.  This case arises under the Court's admiralty and maritime jurisdiction within the meaning of 28 U.S.C. § 1333, Rule 9(h) of the Federal Rules of Civil Procedure, and Rule C of the Supplemental Rules for in rem actions. Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. § 1391(b)(2).

### II.     Negligence

2.  Under general maritime law, a party asserting negligence must show the following to succeed: (1) duty; (2) breach of duty; (3) proximate cause; and (4) actual damage. *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 211 (5th Cir. 2010) (quoting *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000)).

3.  The duty owed under maritime law is one of ordinary care under the circumstances. *Id.* The determination of a tortfeasor's duty is a question of law. *In re Signal International, LLC*, 579 F.3d 478, 490 (5th Cir. 2009). "That determination [of a tortfeasor's duty] involves a number of factors, including most notably the foreseeability of the harm suffered by the complaining party." *Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987). A foreseeable harm "must bear some proximate relationship with the negligent conduct such that it can reasonably be said to be within the 'scope of the risk' created by that conduct.'" *In re Great Lakes Dredge & Dock Co.*, 624 F.3d at 212 (quoting *Consolidated Aluminum Corp.*, 833 F.3d at 67).

4.  One asserting negligence under maritime law must show that the negligence "is the 'legal cause' of the plaintiff's injuries, which is something more than 'but for' causation [-] the negligence must be a substantial factor in causing the injuries." *Id.* at 213-14 (quoting *Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 649 (5th Cir. 1992)) (internal quotations omitted). "[F]ault which produces liability must be a contributory and proximate cause of the collision, and not merely fault in the abstract." *Board of Comm'rs of Port of New Orleans v. M/V Farmsum*, 574 F.2d 289, 297 (5th Cir. 1978). The negligent act or omission must be "a substantial and material factor" in causing the harm. *American River Transp. Co. v. Kavo Kaliakra SS*, 148 F.3d 446, 450 (5th Cir. 1998).

5. Damages "must be allocated according to the degree of the parties' comparative fault." *In re Marquette Transp. Co.*, 292 F. Supp. 3d 719, 734 (E.D. La. 2018) (citing *Penzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1469 (5th Cir. 1991)); *see also U.S. v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 410-11 (1975) (rejecting the divided damages rule which required an equal division of damages among parties unless the parties are equally at fault or proportionate fault is unascertainable).

6. Courts determining the proportionate fault and entitlement to damages first determine the degree of fault of each party and then calculate the damages to which each party is entitled, after which courts will apportion each party's recovery according to the degree of fault. *See Matter of Lasala*, 644 F. Supp. 3d 245, 274-89 (E.D. La. 2022).

### III.   Maritime Presumptions and the Act of God Defense

7. "Liability for collisions on the navigable waters is [often] governed by a series of presumptions and burden-shifting principles." *Illinois Constructors Corp. v. Logan Transp., Inc.*, 715 F. Supp. 872, 879 (N.D. Ill. 1989).

8. The *Oregon* Rule establishes a presumption of fault upon a moving vessel that allides with a properly moored vessel or other stationary structure. *The Oregon*, 158 U.S. 186, 192 (1895); *In re Mid-South Towing Co.*, 418 F.3d 526, 531 n.5 (5th Cir. 2005) (distinguishing the *Oregon* Rule from the *Pennsylvania* Rule because the *Oregon* Rule is a presumption of *fault*, or breach, more "akin to the common law doctrine of *res ipsa loquitor*" while the *Pennsylvania* rule is a presumption of *causation* as a result of a statutory violation).

9. The *Louisiana* Rule "creates a rebuttable presumption that in collisions or allisions involving a drifting vessel, the drifting vessel is at fault." *Combo Maritime, Inc. v. U.S. United Bulk Terminal, LLC*, 615 F.3d 599, 602 (5th Cir. 2010) (citing *James v. River*

*Parishes Co., Inc.*, 686 F.2d 1129, 1131-32 (5th Cir. 1982); *The Louisiana*, 70 U.S. 164, 173 (1865).

10. Courts treat the *Louisiana* and *Oregon* presumptions "similarly, looking to law on one to inform decisions on the other." *Combo Maritime*, 615 F.3d at 605 (citing *Fischer v. S/Y NERAIDA*, 508 F.3d 586, 593 (11th Cir. 2007)). The Fifth Circuit has explained that the *Louisiana* and *Oregon* presumptions speak only to the breach element of negligence, and they are not "presumption[s] regarding either the question of causation (either cause in fact or legal cause) or the percentages of fault assigned parties adjudged negligent." *Id.* at 607 (quoting *In re Mid-South Towing Co.*, 418 F.3d at 532) (discussing the relationship between the presumptions and the principle of comparative fault for damages purposes).

11. "Application of [one of these presumptions] does not supplant the general negligence determination which requires a plaintiff to prove the elements of duty, breach, causation and injury by a preponderance of the evidence." *Id.* at 605 (quoting *City of Chicago v. M/V MORGAN*, 375 F.3d 563, 572-73 (7th Cir. 2004)) (internal quotations omitted). The presumptions operate to "shift the burden of production and persuasion on the issue of fault." *Id.* These presumptions fill an evidentiary vacuum and once "the parties have introduced evidence to dispel the mysteries that gave rise to the presumptions," they become "superfluous." *Id.* (quoting *In re Mid-South Towing Co.*, 418 F.3d at 531) (internal quotations omitted).

12. To rebut liability, a party "can demonstrate (1) that the allision was the fault of the stationary object; (2) that the moving vessel acted with reasonable care; or (3) that the allision was an unavoidable accident. . . . Each independent argument, if sustained, is sufficient to defeat liability." *Id.* (quoting *S/Y NERAIDA*, 508 F.3d at 593); S/Y NERAIDA,

508 F.3d at 596 The rebutting party must make such showing by a preponderance of the evidence. *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 503 (5th Cir. 1994) (citing *American Petrofina Pipeline Co. v. M/V Shoko Maru*, 837 F.2d 1324, 1326 (5th Cir. 1988)).

13. "The first route is essentially the contributory negligence route." *Id.* The second "requires the defendant to negate negligence." *Id.*

14. A party invoking the Act of God defense does so pursuing the third argument above, by showing "that the accident could not have been prevented by 'human skill and precaution and a proper display of nautical skills[.]'" *James*, 686 F.2d at 1133 (quoting *Petition of United States*, 425 F.2d 991, 995 (5th Cir. 1970)).

15. Vessels asserting the Act of God defense are held to a heavy burden, and courts require them to "exhaust every reasonable possibility which the circumstances admit and show that in each they did all that reasonable care required." *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1977) (quoting *Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co.*, 377 F.2d 724, 726 (5th Cir. 1967)); *see also S/Y NERAIDA*, 509 F.3d at 596 ("Such accidents are 'inevitable' or 'unavoidable' in the sense of being overdetermined. In other words, the accident would have happened anyway regardless of what the defendant did. This defense sensibly requires a showing that all reasonable measures would have been futile.").

16. The Act of God defense rebuts the causation element in a maritime negligence claim and will therefore relieve a party of liability even if their conduct was below the standard of care. *Combo Maritime, Inc.*, 615 F.3d at 606 (describing the Act of God defense's burden as "the most difficult burden on the defendant, because as a superceding [sic] causation argument it can free the moving vessel from all liability").

17. To successfully invoke the defense in this case, a party must show that the weather was heavy *and* that they took "reasonable precautions under the circumstances as known or reasonably to be anticipated." *Petition of the United States*, 425 U.S. at 995. Therefore, a hurricane in and of itself is not sufficient to invoke the Act of God defense. *See, e.g.*, *In re Skanska*, 577 F. Supp. 3d 1302, 1323 (N.D. Fla. 2021) (finding that the barge owner "received ample warning about Hurricane Sally's approach" and its failure to relocate its barges to available, safer alternative locations constituted negligence and the vis major defense was thus unavailable to it); *Paragon Asset Co. Ltd. v. Gulf Copper & Manufacturing Corp.*, 622 F. Supp. 3d 360, 403-04 (S.D. Tex. 2022) (noting that while Hurricane Harvey undeniably brought bad weather, the Act of God defense was inapplicable because the vessel owner's "delayed decision and inadequate mooring system represented unreasonably deficient actions").

18. Liability "must turn on whether the [vessel] causing the damage ought ever to have been in that predicament" and therefore courts examine the actions taken in the days preceding a hurricane to assist in such an analysis. *Boudoin v. J. Ray McDermott & Co.*, 281 F.2d 81, 82 (5th Cir. 1960) (discussing damage resulting from Hurricane Audrey).

## IV.    Liability of the Parties

1. Gulf Island seeks to recover damages from the Defendants on the basis that LaShip was negligent in its mooring and storm preparations, and it is therefore liable for the Betty Chouest's breakaway which Gulf Island alleges caused the Wild Horse to breakaway. Specifically, Gulf Island seeks to recover for damages to the War Horse, Wild Horse, Salvo, for related post-breakaway expenses, and for damage to the Bollinger bulkhead

where the War Horse and Wild Horse were moored and which Gulf Island, through its lease agreement with Bollinger, is contractually required to repair.

2.  Defendants seek to recover damages from Gulf Island for damage to the Betty Chouest on the basis that Gulf Island was negligent in its mooring and storm preparations, and it is therefore liable for the post-breakaway damage to the Betty Chouest, alleged to be caused by the loose Wild Horse.

3.   The Betty Chouest and the Wild Horse were both drifting vessels at the time of the collision. Therefore, the *Oregon* presumption and the *Louisiana* presumption facially apply to this set of facts. These presumptions however become superfluous when the parties introduce evidence to dispel the vacuum these presumptions were designed to fill. Both parties have offered and introduced extensive evidence in this matter and therefore the Court proceeds with each party's claims of negligence.

### A. Liability of Defendants

4.  The Court begins with Gulf Island's claim against Defendants and finds that LaShip was negligent in its mooring and storm preparations and that this negligence was a proximate cause of the damages to the Wild Horse, but not to the War Horse, Salvo, or the Bollinger bulkhead.

5.  The eyewitness testimonial evidence by the crew of the Eland establishes that the LaShip vessels broke away prior to the commencement of strong hurricane winds. Those vessels did not come into contact with the Wild Horse or War Horse when they were moored at the Bollinger bulkhead. Multiple crew members testified that they watched the LaShip vessels drift due south without touching the Gulf Island vessels. Master Cooper testified that on at least four occasions, breakaway LaShip vessels made contact with the dry dock

where the Eland was positioned on the opposite side of the Canal from the War Horse and Wild Horse. Cooper Testimony (by depo.), 50:15-50:25.

6.   Accordingly, any damage to the Bollinger bulkhead was not caused by the LaShip breakaway vessels coming into contact with the still-moored War Horse and Wild Horse, since they did not come into contact, and therefore Defendants must not be held liable for these damages. Similarly, any damage incurred by the War Horse is also not attributable to LaShip's breakaway vessels and Defendants are not liable for these damages.

7.   However, the Court finds that LaShip was negligent in its mooring arrangement and that this negligence was a proximate cause of the damages to the Wild Horse, and LaShip is therefore liable as to those damages.

8.   LaShip breached the standard of reasonable care in electing to moor its northernmost tier in a position such that the tier extended beyond the northernmost mooring structure on the shore and the bow of the vessel next to the wharf could not be adequately secured. This caused the northernmost tier of ships to be vulnerable to wind from the north. LaShip's expert, Bill Thomassie, explained that, according to his calculations, the tier had a vulnerability to wind at speeds of approximately 115 mph while the following tiers could withstand wind speeds of up to 135 mph. Thomassie Transcript, 61:17-63:23. He explained that once the northernmost tier broke away, the breakaway cascaded down the tiers, causing all of the moored vessels to break loose.

9.   Master Cooper of the Eland, and other Eland crew members, testified that the LaShip vessels began to breakaway at approximately 1:30p.m. or 1:45p.m. Cooper Testimony (by depo.), 46:10-46:11. Evidence introduced at trial demonstrated that at this time, the wind speed was not in fact as high as 115 mph. According to Defendants' expert meteorologist

16

Craig Setzer's report, at this time of the afternoon, the wind speeds in the area averaged in the 70-80 mph range. Setzer Report, Ex. 60 at 14. Setzer reports that at approximately 2:30p.m., when the outer eyewall began to pass near LaShip's facility, the area was likely experiencing gusts of up to 80 mph. *Id.* at 16. The wind speeds peaked in the vicinity of the LaShip facility between 3:30p.m. and 5:00p.m., when the inner eyewall passed through the area, with LaShip being exposed to wind gusts of up to 125 to 135 mph. *Id.* at 23-24.

10. Other testimony from Eland crew members confirmed that peak winds occurred at the LaShip facility in the later afternoon, after the LaShip vessels had broken away. *See, e.g.*, Applegate Testimony (by depo.), 24:18-25:2 (testifying that the peak weather and wind conditions were around 5:00p.m.); Lloyd Testimony (by depo.), 21:19-22:2 (testifying that the peak weather and wind conditions were between 3:00 and 6:00p.m.).[1]

11. The LaShip vessels broke free before the winds had reached their peak and at a time in the afternoon when wind speeds reached approximately 70-80 mph. The Court concludes that the vulnerability of the improperly moored northernmost tier failed earlier than predicted by Defendants' expert Thomassie and that upon failing, the rest of the tiers soon followed. Based on the uncontroverted eyewitness testimony of the Eland crew members, none of the breakaway LaShip vessels came into contact with the moored Wild Horse and War Horse but rather drifted south down the Canal, at times coming into contact with the Eland dry dock.

12. At trial, witnesses were asked about the mooring arrangement of LaShip's tiered vessels and whether other options would have been available to LaShip to reduce that vulnerability,

---

[1] While one eyewitness aboard the Eland witness testified that he thought the wind peaked at around 1:30p.m., as that was when the weather bird aboard the Eland broke, this is inconsistent with expert reports and other eyewitness testimony which recount that wind speeds peaked later in the afternoon, sometime between 3:00 and 6:00p.m.

for example by instead tying the three vessels in the northernmost tier to other tiers that consisted of only two vessels. Since the position of the northernmost tier created a vulnerability as a result of the unavailability of mooring structures ashore, the Court finds that it would have been reasonably prudent to moor the three vessels in the northernmost tier in a different manner such that no tier extended beyond the northernmost mooring structure. The Court acknowledges the testimony of Wally Naquin, who when questioned about repositioning the tiers along the Canal, explained that one never knows where the wind will come from in hurricane conditions and had LaShip repositioned vessels and the wind had a different direction, the same result may have occurred. He also explained that all vessels, whether tiered or moored single, broke free. *See* Naquin Testimony, 51:24-53:1. However, given the unavailability of mooring structures ashore at the northernmost position and the vulnerability this created, compounded by fact that the vessels broke free before the peak winds reached the area, the Court nevertheless concludes that LaShip bears some liability for the damages that resulted from the breakaway of the Betty Chouest and the ensuing damage post-breakaway to the Wild Horse.

### B. Liability of Plaintiff

13. Turning to Defendants' counterclaim against Gulf Island, the Court finds that Gulf Island was negligent in its mooring arrangement and storm preparations and that as a result it is liable to Reel Pipe, the owner of the Betty Chouest as of August 29, 2021, for the damage sustained by the Betty Chouest following the Wild Horse's breakaway.

14. The evidence adduced at trial demonstrated several critical deficiencies in the Wild Horse and War Horse mooring arrangement. The use of mixed lines, in conjunction with their level of slack and misalignment with ship bitts, constituted improper mooring practices.

For example, Thomassie described that as used on these two vessels, the mixture of steel and rope wires was not a recommended practice because they were laid slack across one another such that they would interfere and "grind against each other pretty significantly" and over time they would weaken. Thomassie Transcript, 36:23-37:7. He also identified that one of the steel cables did not connect directly to a bitt on the deck of one of the vessels and instead was wrapped around a handrail. *Id.* at 37:14-37:22. When asked about slack and recommended levels of pretension in mooring lines to accommodate tidal flow and rising seas in storm conditions, Thomassie testified that, as used on the War Horse and Wild Horse, the amount of slack exceeded what is proper and that the vessel "would have to move out ten feet, maybe more, 20 feet, in order to start picking up the slack of that line," calling this "effectively not moored." *Id.* at 38:13-38:16.

15. Significantly, the concrete blocks used as mooring structures on the Bollinger bulkhead to which many of these lines were affixed were also against standard practice. Unburied concrete blocks sitting on gravel and turf do not contain a holding capacity equal to their weight. Rather, the holding weight is instead "whatever that block will resist as it's being drug across the turf." *Id.* at 43:9-43:23. That the bulkhead and facility were flooded further decreased the resistance of the unburied concrete blocks, as the ground was slick and more conducive to the blocks' movement. Importantly, photographs taken using Google Earth at various time periods before and after the storm show that the blocks were in fact dragged in a pattern that supports these findings, and Gulf Island does not dispute that it retrieved some of these blocks from the Canal after the storm. Ex. 61, fg. 5-8.

16. The Court finds that these various factors each constituted substandard mooring and that as a result, damage was incurred to the Bollinger bulkhead as well as to the War Horse, which remained partially moored to the dock following the storm.

17. The Court further finds that Gulf Island's improper mooring practices were the proximate cause of the breakaway of the Wild Horse and thus a substantial and material factor in the damage that ultimately resulted when the Wild Horse became adrift and collided with the already-adrift Betty Chouest at some point in the Canal or slip, as evidenced by the paint marks on the Wild Horse.

18. The Court accordingly must find that Defendants in this case have shown by a preponderance of the evidence that Gulf Island's mooring arrangement was substandard and insufficient to withstand the expected hurricane forces and that Gulf Island accordingly bears liability for the damages to the Betty Chouest that resulted from the improper mooring of the Wild Horse.

### C. Proportion of Fault

19. Both parties are at fault and accordingly the Court must determine the comparative fault of the parties in order to apportion damages. Based upon all of the evidence at trial, the Court concludes that Gulf Island is 65% at fault and that LaShip is 35% at fault for the collision that occurred after each party's vessels independently broke loose and drifted into one another, causing damage. Gulf Island bears the majority of fault due to both the number of deficiencies as well as the nature of the deficiencies in its mooring arrangement of the War Horse and Wild Horse. Specifically, the use of the mixed lines and their level of slack and overlay with one another, that at least one line was roped around a handrail in order to attach to a bitt on the ship, and the use of the unburied concrete blocks.

20

20. LaShip however is not without fault and could have rearranged its vessels such that a tier of vessels did not extend beyond the northernmost shoreside mooring structure. While their expert testified that his calculations show a breakaway wind speed of about 115 mph for that northernmost tier, compared to about 135 mph for the rest of the tiers, credible evidence at trial showed that that vulnerable tier broke free when the wind was at a speed of around 70 to 80 mph, indicating that the mooring arrangement was insufficient to withstand expected hurricane winds. Accordingly, the Court finds LaShip 35% at fault for the damage to the Wild Horse that followed the breakaways.

21. Applying the proportionate fault to the damages to which each party is entitled, the Court rules as follows:

   a. Gulf Island has shown that it is entitled to damages in the amount of $503,130.51, representing reasonable and necessary repairs to the Wild Horse and Salvo following the Wild Horse's collision with the Betty Chouest. Because LaShip is 35% at fault, Gulf Island is entitled to recover $ 176,095.68 from LaShip for these damages.

   b. Defendants have shown that Reel Pipe is entitled to damages in the amount of $860,201.00 representing reasonable and necessary repairs to the Betty Chouest following the collision with the Wild Horse as a condition of the Betty Chouest's sale. Because Gulf Island is 65% at fault. Reel Pipe is entitled to recover $559,130.65 from Gulf Island for these damages.

New Orleans, Louisiana, this 7th day of February, 2024.

_____
United States District Judge